UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
PABLO ALMONTE,                         :      13 Civ. 6187 (CM) (JCF)
                                       :
          Petitioner,                  :          REPORT AND
                                       :        RECOMMENDATION
     - against -                       :
                                       :
WILLIAM LEE, Green Haven C.F.          :
Superintendent,                        :
                                       :
          Respondent.                  :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE COLLEEN McMAHON, U.S.D.J.:

     Petitioner Pablo Almonte, proceeding pro se, filed this
petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254
challenging his conviction for felony-murder.  Now represented by
counsel, he seeks relief on two primary grounds.  He contends that
(1) he was denied his right to a speedy trial when, after
presenting an essentially completed case to the grand jury, the
State allowed the case against him to lapse for ten years; and (2)
he was denied effective assistance of counsel when his defense
attorney failed to object to a number of constitutional violations
at trial.[1]  I recommend denying the petition.

---

[1] Mr. Almonte alleges three constitutional errors at his trial
-- introduction of statements from his non-testifying co-defendant
that implicated Mr. Almonte in the robbery that underlay the
felony-murder charge; inadequate jury instructions on larceny,
which is an element of robbery; and use of photographs of the
victim during the prosecution's opening and closing statements --
and raises each as a ground for relief independent of his
ineffective assistance argument.  However, as discussed below,
these errors were waived by counsel's failure to object, so they
will be addressed only in the context of his counsel's purported
ineffective assistance.

1

Background[2]

Mr. Almonte was convicted in connection with the killing of a police officer, which occurred while the petitioner, his co-defendant Jose Fernandez, and another person were fleeing from police after relieving a drug dealer of an amount of cocaine. Because the story of this crime, its participants, and its aftermath is somewhat complex, I will begin by outlining (in a light favorable to the prosecution) some relevant facts and introducing some critical players before addressing the details.[3]

On October 18, 1988, Mr. Almonte, Mr. Fernandez, Luis Jose Alvarez Salazar, Daniel Mirambeaux, Marcos Jacquez, and Freddie Parra hatched a plan to steal cocaine from Hector Paulino. The scheme involved Mr. Alvarez returning to Mr. Paulino's apartment building to purchase drugs that he had, earlier in the day, refused to buy because of their poor quality. After Hector Paulino's nephew Rafael Paulino (who, along with his cousin, Robinson Paulino, assisted Hector Paulino in his drug trade) took the cocaine from the safe in which it was kept, Mr. Almonte, Mr. Fernandez, and Mr. Mirambeaux, who had his gun drawn, entered the

_____

[2] This recitation focuses on the testimony, argument, and procedural history that is relevant to Mr. Almonte's claims.

[3] The facts are gleaned from the trial record and the parties' briefs. The procedural history is also informed by the trial court's decision on Mr. Almonte's motion to dismiss the indictment, People v. Almonte, 190 Misc. 2d 783, 740 N.Y.S.2d 763 (N.Y. Sup. Ct. 2002) ("Almonte I"), the Appellate Division's affirmation of Mr. Almonte's conviction, People v. Almonte, 90 A.D.3d 579, 935 N.Y.S.2d 293 (1st Dep't 2011) ("Almonte II"), and, to a limited extent, the decision on the § 2254 petition of Jose Fernandez, Mr. Almonte's co-defendant, see Fernandez v. Artus, No. 07 Civ. 2531, 2008 WL 4620336 (S.D.N.Y. Oct. 17, 2008).

apartment, tied up Mr. Alvarez and others in the apartment, put the drugs in a bag, and left.

On their way out of the building, however, Mr. Almonte and Mr. Mirambeaux were spotted by two police officers, Michael Buczek and Joseph Barbato, who followed them onto the street and ordered them, unsuccessfully, to stop.  The officers nevertheless caught up to them and grabbed Mr. Almonte and Mr. Mirambeaux.  Mr. Mirambeaux drew his gun and shot Officer Buczek, fatally wounding him.  Officer Barbato returned fire, and in the melee Mr. Almonte was hit in the shoulder.  Mr. Almonte and Mr. Mirambeaux were able to escape, although Mr. Almonte left his jacket behind.  Meanwhile, Mr. Fernandez, who had possession of the bag of drugs, dropped it between two cars about a block away from Mr. Paulino's apartment.

The next day, after receiving some treatment for his wound courtesy of a doctor known to Mr. Parra's friend Diogenes Hernandez, Mr. Almonte and his wife flew from New York City to the Dominican Republic.  A few days later, Mr. Fernandez, Mr. Mirambeaux, and Mr. Parra also decamped to Santo Domingo.

A. <u>Grand Jury</u>

A grand jury was convened in January 1989 to investigate Officer Buczek's death.  The grand jury took evidence from twenty-five witnesses and received over thirty exhibits related to both Mr. Mirambeaux and Mr. Almonte; however, on March 30, 1989, the prosecutor asked the grand jury to consider charges as to Mr. Mirambeaux only.  <u>Almonte I</u>, 190 Misc. 2d at 764, 740 N.Y.S.2d at 784-85.  He was indicted on charges of robbery and of murder of

3

varying types and degrees.  Id. at 785, 740 N.Y.S.2d at 764. Although the grand jury twice extended its term, it was never asked to indict Mr. Almonte.  Id.

The investigation and prosecution of Mr. Almonte lapsed until police received new evidence, including information from Mr. Alvarez that differed from information he had given when interviewed soon after the shooting.  Id. at 791, 740 N.Y.S.2d at 769; Almonte II, 90 A.D.3d at 579, 935 N.Y.S.2d at 294.  In October 1998, after hearing from eleven witnesses, eight of whom had testified in 1989, a second grand jury indicted Mr. Almonte on one count of felony-murder.  Almonte I, 190 Misc. 2d at 785, 740 N.Y.S.2d at 764.  He was arrested by Dominican authorities in November 2000 and extradited to the United States in 2001.

The petitioner filed an omnibus motion that sought, among other things, to dismiss the indictment on grounds of unauthorized withdrawal (a state law claim) and pre-indictment delay (a state and federal due process claim).  Id.  The trial court dismissed the indictment on state law grounds (rejecting Mr. Almonte's due process argument) but granted leave to re-present the case to a third grand jury.  Id. at 788-89, 792-93, 740 N.Y.S.2d at 767, 770. The third grand jury again indicted Mr. Almonte for felony-murder.

B.  Trial Evidence

On the afternoon of October 18, 1988, Mr. Alvarez, a/k/a Radames Matos (Trial Transcript ("Tr.") at 477), visited Hector Paulino at his fourth floor apartment in a building near the corner of Broadway and West 161st Street in Manhattan to pick up a

kilogram of cocaine, which he would pay for later, presumably after he had sold it.  (Tr. at 86-87, 256-57, 395, 480-81, 489, 535). Mr. Paulino, from whom Mr. Alvarez had previously procured drugs to sell in the Bronx, kept his inventory in a bedroom of an apartment on a different floor of the same building. (Tr. at 481-83, 534). There were five or six kilograms of cocaine in the downstairs apartment but, having been taken to see it, Mr. Alvarez decided against purchasing the poor quality product.  (Tr. at 481, 537-38). He then returned to the spot where he sold drugs in the Bronx. (Tr. at 482-83, 541-42).

Once there, he saw Mr. Almonte (whom he knew as "Emelio"), Mr. Fernandez, Mr. Mirambeaux, Mr. Jacquez, and Mr. Parra, and informed them of Mr. Paulino's stock of cocaine.   (Tr. at 483-86).  They hatched a scheme to take the drugs that involved Mr. Alvarez returning to Mr. Paulino to say that he had changed his mind about the purchase.  (Tr. at 486-89, 575-77).  Mr Alvarez did so, and was taken to the downstairs apartment by one or both of Mr. Paulino's nephews, Rafael Paulino and Robinson Paulino.  (Tr. at 90-91, 399, 490-91, 580).  After Rafael Paulino had retrieved the cocaine, he opened the apartment's front door, either in response to a knock or because he and Mr. Alvarez were planning to leave the apartment. (Tr. at 402-03, 492, 583-84).  Mr. Mirambeaux, who was armed with a gun, Mr. Fernandez, and Mr. Almonte entered and proceeded to tie up Mr. Alvarez and the Paulino nephews.  (Tr. at 91-93, 436, 492-95, 583-84).  During the incident, Viola Medrano and two of her relatives, who lived in the portions of the downstairs apartment

not used by Mr. Paulino, entered the building, passing two police officers in the lobby. (Tr. at 188-89). Ms. Medrano was pulled into the apartment after she opened the door; eventually, she and her relatives were also tied up. (Tr. at 189). Ms. Medrano informed the three intruders about the police officers in the building. (Tr. at 192, 410). Hearing this news, Mr. Fernandez, Mr. Mirambeaux, and Mr. Almonte put the drugs in a black bag and rushed from the apartment. (Tr. at 410-11, 448-49). There is conflicting testimony about the amount of cocaine in the bag; it was variously estimated at one and one-half pounds, one kilogram, and five kilograms (Tr. at 451, 978, 2507).

The two police officers spotted by Ms. Medrano were Officer Buczek and Officer Barbato, who had responded to an unrelated medical call in Mr. Paulino's building. (Tr. at 249-50). They determined that police presence was unnecessary and, as they were leaving the building, stopped to talk with Emergency Medical Services personnel who were then entering. (Tr. at 253, 358-60). While Officers Buczek and Barbato and the EMS personnel were chatting, they saw two men come down the stairs and cross the lobby to exit the building. (Tr. at 253-54, 361-62). The officers, believing that the two men were behaving suspiciously, followed them outside and ordered them to stop. (Tr. at 254-56, 360-62). The men did not comply, but the officers caught up with them on Broadway less than one block from Mr. Paulino's apartment building. (Tr. at 256-59). Officer Buczek grabbed one of the two, who attempted to struggle out of his jacket. (Tr. at 259, 263). The

other man began firing his gun. (Tr. at 264). Officer Barbato returned fire as the two men ran away, but then turned his attention to Officer Buczek, wounded by a gunshot to the left side of his chest. (Tr. at 266-67, 269).

While this fracas was occurring, Anthony Jorge, who was selling drugs on West 160th Street, heard the shots and saw a group of people walking quickly east on the block, followed by a cohort of three men. (Tr. at 999-1000). Two of the three -- identified as Mr. Mirambeaux and Mr. Almonte, who was bleeding from his left shoulder -- fell behind, while one continued on, dropped a black garbage bag near the curb, and walked away. (Tr. at 1000-02, 1005, 1007-1010). Mr. Almonte and Mr. Mirambeaux were driven uptown in a cab. (Tr. at 1006-07). According to Mr. Jorge, the bag contained drugs and money, all of which were taken by passersby. (Tr. at 1011-12).

Meanwhile, Detective Patrick Streffacio responded to the scene of the shooting and recovered a short down jacket at the corner of West 160th Street and Broadway. (Tr. at 767-68). Having accompanied Officers Barbato and Buczek to the hospital, Detective Streffacio handed off the jacket to Detective Edward Stano. (Tr. at 771, 812). The jacket held a gun and a key ring with several keys. (Tr. at 769, 813). There were several holes in the jacket and it had blood on it that, when tested some years later, matched Mr. Almonte's DNA profile, as well as the DNA profile of blood samples that were recovered from the area of the shooting. (Tr. at 813, 1264-69, 1469-1504; Memorandum of Law and Answer in Support of

Answer Opposing Petition for a Writ of Habeas Corpus ("Resp.
Memo.") at 28; Memorandum of Law for Petitioner ("Pet. Memo.") at
18).  It was also later discovered that one of the keys on the key
ring fit a lock on an apartment building in Jamaica, Queens, where
Mr. Almonte and his wife had lived in 1988, and another key fit the
ignition of a car that had been owned by Mr. Fernandez.  (Tr. at
899-910; 918-26, 1658-59).

The evening of the shooting, Mr. Mirambeaux, Mr. Fernandez,
Mr. Almonte, and Mr. Parra arrived at the Brooklyn apartment of Mr.
Hernandez and his then-wife Yvette Narvaez.  (Tr. at 1070, 1339-
43).  Mr. Almonte, who was called "Neno," had an injury to his left
arm.[4]  (Tr. at 1075, 1343-44).  Mr. Mirambeaux explained that,
after they had left an apartment they had tried to rob, someone
shot a gun out of the window, striking Mr. Almonte.  (Tr. at 1076,
1344).  They sought medical treatment for Mr. Almonte from Mr.
Hernandez's brother, who was a physician, but when he could not be
reached, they fetched a "Dominican doctor" who worked in a friend's
grocery store.  (Tr. at 1073, 1077-78, 1347-48).  While Mr. Almonte
was being treated, Mr. Mirambeaux retrieved the petitioner's wife
from Queens and instructed her to purchase plane tickets to the
Dominican Republic for Mr. Almonte and herself.  (Tr. at 1081-83,
1349-50).  They flew to Santo Domingo the next day.  (Tr. at 1399-
1400).  Mr. Fernandez sold his car to a friend, stating that he was

---

[4] At trial, Ms. Narvaez was unable to identify Mr. Fernandez
and was not "a hundred percent positive" that Mr. Almonte was the
person she knew as "Neno."  (Tr. at 1354-56).  Mr. Hernandez was
able to identify both defendants.  (Tr. at 1083-89).

returning to Santo Domingo to care for an ill family member. (Tr. at 1570-72). On October 22, 1988, Mr. Mirambeaux, Mr. Parra, and someone named "Pedro Peralta," a name that Mr. Fernandez sometimes used, flew to Santo Domingo. (Tr. at 1171-72, 1408-30). Mr. Mirambeaux was arrested in the Dominican Republic in 1989, but died while in law enforcement custody in June of that year.[5] (Tr. at 2389-92).

Shortly after the shooting, Mr. Alvarez began to cooperate with the investigation, hoping to negotiate some leniency for his recently-arrested brother. (Tr. at 503-04). In December 1997, after he himself had been arrested, Mr. Alvarez again spoke to investigators about the incident. (Tr. at 512-14). Mr. Alvarez's first iteration, in 1988, concealed his own involvement by asserting that he had learned the details about the robbery and shooting from Mr. Jacquez. (Tr. at 506). In 1997, he admitted that he had been involved in planning the robbery. (Tr. at 506, 514).

During the early 1990s, Mr. Fernandez met a former acquaintance named Luis Conrado Ramirez Matos in the Dominican Republic. (Tr. at 2344). The two renewed their acquaintance and Mr. Fernandez eventually made a confession to Mr. Ramirez. (Tr. at 2346, 2349-50). He described having participated in a crime with two others during which a police officer died. (Tr. at 2350).

---

[5] The circumstances of Mr. Mirambeaux's death are unclear, see James C. McKinley, Jr., Conflicting Accounts Emerge of Suspect's Death, N.Y. Times, July 2, 1989, available at http://www.nytimes.com/1989/07/02/nyregion/conflicting-accounts-emerge-of-suspect-s-death.html, but irrelevant here.

According to Mr. Ramirez, Mr. Fernandez said that he and the two others had learned about a home that contained drugs or money. (Tr. at 2351).   They went to the home, knocked and entered, and then tied up the inhabitants.  (Tr. at 2351).  As they left, they had an encounter with the police.  Tr. at 2351-52).  One of Mr. Fernandez's companions told Mr. Fernandez that he had "dropped" one of the officers.  (Tr. at 2352).  In addition, one of his companions was wounded during the encounter.  (Tr. at 2351-52). They put the wounded man in a car and drove away.  (Tr. at 2353). Mr. Fernandez reported that they took the wounded man to a doctor who recommended an operation but could not himself perform it. (Tr. at 2353).  The next day, they left for Santo Domingo.  (Tr. at 2353).  After Mr. Fernandez and Mr. Ramirez had a falling out, Mr. Ramirez reported this confession to law enforcement personnel from the Dominican Republic and the United States.  (R. at 2363-69).

In  February  2000,  the  United  States  Marshals  Service established an office in the Dominican Republic, in part because the Department of Justice had identified the country as a haven for fugitives.  (Tr. at 1682).  Mr. Almonte's case was a priority. (Tr.  at  1683).   Law  enforcement  in  the  Dominican  Republic eventually located and arrested Mr. Almonte, who was transported to Santo Domingo.  (Tr. at 1700-01).  He was housed in a unit for prisoners charged with extraditable offenses where he met Jose Soller, a United States citizen who had been arrested in the Dominican Republic.  (Tr. at 1701, 1831-33).  Mr. Soller testified that Mr. Almonte began asking him questions about extradition and

ended up relating details about the 1988 crime. (Tr. at 1838-42). Mr. Almonte stated that he and Mr. Mirambeaux went to collect some money owed to Mr. Mirambeaux. (Tr. at 1845-46). Armed with guns, they visited the debtor, pushed their way into his apartment, and forced him to give them the money. (Tr. at 1846-47). On the way out they saw two police officers helping to load someone into an ambulance. (Tr. at 1847). The officers followed them out of the building. (Tr. at 1848). As one of the officers grabbed Mr. Almonte by the jacket, Mr. Mirambeaux fired the gun. (Tr. at 1848). Mr. Almonte "swirled out of" the jacket, picked it up, and walked away. (Tr. at 1848). Mr. Almonte asserted that, in addition to both officers being shot, he himself had been shot in the arm. (Tr. at 1848-49). He later dumped the jacket, got into a car, and drove off. (Tr. at 1848-52). He sought treatment for his arm, and left the next day for the Dominican Republic. (Tr. at 1853).

Mr. Fernandez was apprehended in the Dominican Republic in December 2001 and extradited to the United States. (Tr. at 2449). While being held prior to trial, he met Jose Fuertes, a Dominican national awaiting sentencing. (Tr. at 2495). Mr. Fuertes testified that as he and Mr. Fernandez got friendly, Mr. Fernandez told him about the crime with which he was charged and continued those discussions while the Fernandez/Almonte trial was going on. (Tr. at 2497-99). Mr. Fernandez described a robbery of a drug dealer in which he and some others entered an apartment, tied up the inhabitants, and stole drugs. (Tr. at 2500-02). Mr.

Fernandez's colleagues then told him to take the bag of drugs and leave the apartment, because police were in the building.  (Tr. at 2502).  Although he left the building before the others, he became aware of an altercation between his companions and the police, and he heard a gunshot.  (Tr. at 2503-04).  Because of the police presence, Mr. Fernandez dropped the bag and walked away.  (Tr. at 2504-05).  Mr. Fernandez asserted that Robinson Paulino was not in the apartment, but Rafael was, and that he and his companions stole approximately five kilograms of cocaine.  (Tr. at 2506-07).

The defendants did not call any witnesses.

C.   <u>Closing Arguments and Jury Instructions</u>

In his summation, Mr. Almonte's attorney, Fred Bittlingmaier, argued in part that the story of the robbery told by the prosecution was implausible and that its witnesses were not credible, stating, "[W]hen you look at the credible evidence that was presented in this case, you have to have a reasonable doubt as far as what exactly happened in that apartment . . . ."  (Tr. at 2747).  He noted that, given the large police presence on that block, it was unlikely that anyone would choose to rob a drug dealer there (Tr. at 2749-55); he called attention to the fact that, as the witnesses who were allegedly in the apartment testified, there was little or no security safeguarding the drugs (Tr. 2757); he contended that Rafael and Robinson Paulino's identifications were unreliable based on the brief and traumatic interaction they had with the robbers years before the identification line-up (Tr. at 2758); and he questioned the story

12

that the apartment's inhabitants had been brutalized and tied up,
given their lack of injuries (Tr. at 2766).  He further called
attention to the fact that the allegedly stolen drugs disappeared:

> Coincidentally, five or six hours after Hector Paulino
> shows off his stash, it's ripped off.  It's gone.
> Whether it's one kilo, one and a-half kilos or five to
> six kilos, it's worth something and one minute it's there
> and the next minute it's not, if you believe that this
> robbery took place.

(Tr. at 2755-56).  Although he admitted that Mr. Almonte had been
shot on the day Officer Buczek was killed and left for the
Dominican Republic the next day, Mr. Bittlingmaier insisted,
"[T]hat in no way . . . is evidence that he robbed anyone, or had
anything to do with the murder of Officer Buczek. [Mr. Almonte] was
shot on Broadway and he was scared."  (Tr. at 2801-02).

The prosecution began by highlighting the victim, showing the
jury two photographs -- one of Officer Buczek alive, which had been
introduced during Detective Streffacio's testimony, and another of
him during or after his autopsy, which had been introduced during
the medical examiner's testimony -- identifying him as a "police
officer, ordinary human being, a friend, partner, husband, son,
brother. . . .  [L]ike any of you, like any human being," and
urging the jurors to "[k]eep in mind . . . the whole humanity, the
once living being whose death brings us here.  Use that to help
keep your focus, keep you on track on the evidence, using logic and
really deciding this case properly."  (Tr. at 2821-22; Pet. Memo.
at 15 n.4).  The prosecutor also addressed a perceived implication
of Mr. Almonte's counsel's closing, stating,

> Not a drug deal, as I guess the defense is trying to

13

imply occurred here.  It is a robbery.

. . . [Y]ou don't tie up people in an apartment if you're buying drugs. . . .  You tie up people, victims and the innocent people who happen to be there, if it's robbery.  That's what makes sense[]. . . .

So that's the robbery.

The defendants take at gunpoint[] a large amount of cocaine.

And the exact amount of cocaine they took, whether one kil[o]gram or five kilos, whether they also got money [], it doesn't matter.

(Tr. at 2835-36).

Two jury instructions are relevant to Mr. Almonte's claims.

First, instructing the jury on robbery, the trial court stated:

According to the law, a person commits robbery when he forcibly steals property.

A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes such property from an owner thereof.

And an owner is a person who has a right to possession of the property superior to that of the taker.

A person forcibly steals property and commits robbery when, in the course of committing a larceny[,] that is, a theft, he uses or threatens the immediate use of physical force upon another person for the purpose of preventing or overcoming resistance to the taking of property or to the retention thereof immediately after the taking or compelling the owner of such property to deliver up the property.

(Tr. at 3017-18).  The jury did not receive instruction on the meaning of the terms "deprive" or "appropriate."

The court also instructed the jury on the treatment of admissions by a defendant:

[E]vidence of any admission made by a defendant, assuming you accept it, may be considered by you only as to the

14

defendant who made that admission.  Such evidence is not applicable to, nor is it binding upon the other defendant.  And you must not draw from this evidence any inference unfavorable to the other defendant in the case.

Again, evidence of an admission made by a defendant, if you accept it, may be considered by you only with regard to that particular defendant.  It may not be considered as any kind of evidence against the other defendant.

(Tr. at 2999-3000).

D.   Post-Conviction Proceedings

On direct appeal, the Appellate Division affirmed Mr. Almonte's conviction.  As to the delay in indictment, it found that "[t]he [prosecution] reasonably concluded that, regardless of whether they could obtain an indictment against [Mr. Almonte], they did not have sufficient evidence to obtain a conviction.  The record reflects that the investigation did not continue because the [prosecution] had exhausted all reasonable investigative steps."  Almonte II, 90 A.D.3d at 579, 935 N.Y.S.2d at 294.  The court dismissed Mr. Almonte's claims of prejudice as "unpersuasive. While [he] cites to some lost witnesses and physical evidence, there is no reason to believe that any of this proof would have been exculpatory."  Id.  The Appellate Division held that Mr. Almonte's constitutional claims "regarding redacted statements by a nontestifying codefendant, photographic evidence, and a portion of the court's charge" were not preserved and, alternatively, were "no basis for reversal"; his ineffective assistance of counsel claims were "unreviewable on direct appeal."  Id. at 580, 935 N.Y.S.2d at 294-95.  The New York Court of Appeals denied leave to appeal.  People v. Almonte, 19 N.Y.3d 956, 950 N.Y.S.2d 108 (2012)

15

(table).

In a motion pursuant to Criminal Procedure Law § 440.10, Mr. Almonte argued that his trial counsel was ineffective for the same reasons he presents in this petition: that his attorney failed to object to introduction of photographs of Officer Buczek, to introduction of inculpatory statements by his co-defendant, Mr. Fernandez, or to allegedly inadequate jury instructions on robbery.[6] (Decision and Order dated March 20, 2014 ("440.10 Opinion"), attached as Exh. L to Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("App.") at 1-2).[7]

The § 440.10 court relied on the Appellate Division's comment that the constitutional claims made on direct appeal were not bases for reversal in asserting that Mr. Almonte could not raise them again. (440.10 Opinion at 2). However, the court also rejected each of them on its merits. The court stated, "The introduction of multiple photographs of the deceased was permissible," and the failure to object did not constitute ineffective assistance. (440.10 Opinion at 3 (citing People v. Lawson, 114 A.D.3d 962, 980 N.Y.S.2d 586 (2d Dep't 2014), and People v. Santiago, 22 N.Y.3d 740, 968 N.Y.S.2d 375 (2014)). Similarly, the court found that the "failure to elaborate on the definitions of 'deprive' and

_____

[6] Two additional claims, not relevant here, were included in the motion.

[7] The respondent did not include the petitioner's full memorandum of law in support of his § 440.10 motion in the Appendix; indeed, the argument section has been omitted completely. (Memorandum of Law, attached as part of Exh. J to App.). Therefore, I have cited the court's opinion denying the motion.

16

'appropriate' [] would not warrant vacatur of the judgment" because the terms "have no extraordinary meaning" and because "there was no real issue that . . . the gunpoint robbery . . . was merely a voluntary consignment." (440.10 Opinion at 3). The court found that the "out-of-court statements of co-defendant Fernandez were carefully redacted to avoid mention of defendant, who was only one of a group involved in the robbery," that the limiting instruction was sufficient to correct any possible misapplication of that evidence against Mr. Almonte, and that "in light of the crushing evidence against [Mr. Almonte], any error was harmless beyond a reasonable doubt." (440.10 Opinion at 5). Leave to appeal was denied. (Pet Memo. at 57).[8]

<u>Discussion</u>

    A.   <u>Legal Standards</u>

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") dictates that an application for a writ of <u>habeas corpus</u> pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Thus, "[u]nder § 2254(d), a habeas

---

    [8] The respondent did not include the order denying leave to appeal in the Appendix.

court must determine what arguments or theories supported[] or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011).

A state court decision is "contrary to" clearly established precedent when the court applies a rule that is "diametrically different," "opposite in character or nature," or "mutually opposed" to the governing law set forth in Supreme Court cases. <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000). "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002) (internal citations omitted). The inquiry focuses not on whether the state court's application of clearly established federal law is merely incorrect or erroneous, but on whether it is objectively unreasonable, a substantially higher threshold. <u>See</u> <u>id.</u>

"[The] AEDPA instructs that, when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' The prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" <u>Burt</u>

18

v. Titlow, __ U.S. __, __, 134 S. Ct. 10, 15 (2013) (quoting 28 U.S.C. § 2254(d)(2), (e)(1)).   An determination of fact is not unreasonable because merely incorrect -- the standard is "substantially higher." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).   "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood v. Allen, 558 U.S. 290, 301 (2010) (second and third alterations in original) (quoting Rice v. Collins, 546 U.S. 333, 341-42 (2006)).   Rather, to meet this standard, a state court's factual determination "must be sufficiently against the weight of the evidence that it is objectively unreasonable." Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010).

    B.   Speedy Trial

    Mr. Almonte argues that his constitutional right to a speedy trial was violated when "the State, after having presented an essentially completed case to the grand jury in 1989, . . . allowed the prosecution to lapse for ten years." (Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody at 2 (capitalization and quotation marks omitted); Pet. Memo at 57 (same)).

    The Sixth Amendment guarantees "the accused . . . the right to a speedy and public trial." U.S. Const., amend. VI. The Supreme Court has identified some factors courts should assess in determining whether this right has been violated: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his

right, and prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530 (1972); accord Vermont v. Brillon, 556 U.S. 81, 90 (2009) Doggett v. United States, 505 U.S. 647, 650 (1992).  To succeed on a such claim, a petitioner must show that the "state court could not have undertaken the 'difficult and sensitive balancing process' called for in Barker and reasonably concluded that his speedy trial claim fails." Smith v. La Clair, 353 F. App'x 486, 490 (2d Cir. 2009) (internal citation omitted).

Mr. Almonte's claim, however, fails for a much more fundamental reason than that the state court reasonably applied the Barker factors.  "[T]he Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,'" which occurs upon arrest or "indictment, information, or other formal charge." United States v. Marion, 404 U.S. 307, 313, 321 (1971); see also, e.g., Doggett, 505 U.S. at 655 (stating that "the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution," which is "triggered by arrest, indictment, or other official accusation"); United States v. Dowdell, 595 F.3d 50, 61 (1st Cir. 2010) ("The Sixth Amendment right to a speedy trial attaches upon formal accusation.  In the typical case, this means either arrest or indictment, whichever comes first." (internal citations omitted)); United States v. Knight, 562 F.3d 1314, 1323 (11th Cir. 2009) ("'The Sixth Amendment right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial.'" (quoting United

20

States v. Walters, 591 F.2d 1195, 1200 (5th Cir. 1979)); United States v. Erenas-Luna, 560 F.3d 772, 776 (8th Cir. 2009); United States v. Bloom, 865 F.2d 485, 491 (2d Cir. 1989) (Sixth Amendment speedy trial right attaches on indictment or when defendant arrested or "subjected to substantial restrictions for purposes of answering a criminal charge"); United States v. Watson, 599 F.2d 1149, 1156 (2d Cir. 1979) (Sixth Amendment speedy trial right attaches on public filing of indictment or when defendant arrested or otherwise formally apprised of charges); United States v. Moreno, 997 F. Supp. 2d 165, 172 (N.D.N.Y. 2014); United States v. Gutierrez, 891 F. Supp. 97, 99-100 (E.D.N.Y. 1995) aff'd, 112 F.3d 506 (2d Cir. 1996).  The pre-indictment delay of which Mr. Almonte complains does not implicate his Sixth Amendment rights.

To be sure, the Supreme Court has acknowledged that the Constitution "has a limited role to play in protecting against oppressive [pre-indictment] delay" through the Due Process Clause. United States v. Lovasco, 431 U.S. 783, 789 (1977).  But here, Mr. Almonte does not argue explicitly that there has been a due process violation (although he did to the state courts); rather, his brief focuses on precedent addressing the Sixth Amendment speedy trial right.  Nevertheless, I will analyze this claim as if he had clearly presented a due process claim.[9]

---

[9] There is a somewhat complex exhaustion issue lurking here. New York law does not distinguish between pre-indictment and pre-trial delay, analyzing both under a rubric nearly identical to the one the Supreme Court outlined in Barker for asserted violation of the speedy trial right.  See People v. Singer, 44 N.Y.2d 241, 253-54, 405 N.Y.S.2d 17, 25 (1978); People v. Taranovich, 37 N.Y.2d 442, 445, 373 N.Y.S.2d 79, 81-82 (1975).  Mr. Almonte seems to have

Statutes of limitations are "'the primary guarantee against bringing overly stale criminal charges.'" Marion, 404 U.S at 322 (quoting United States v. Ewell, 383 U.S. 116, 122 (1966)).  Thus, the Supreme Court has held that a due process claim based on pre-indictment delay requires "proof of actual prejudice." Lovasco, 431 U.S. at 789-90.  It has "suggested" that if, in addition to establishing actual prejudice, a defendant shows that "the Government intentionally delayed 'to gain tactical advantage over the accused,' due process might be violated." Watson, 599 F.2d at 1152-53 (quoting Marion, 404 U.S. at 324); cf. Arizona v. Youngblood, 488 U.S. 51, 57 (1988) (citing Marion and Lovasco for proposition that to establish constitutional violation derived from loss of evidence, bad faith by prosecution must be shown).  "A defendant bears the 'heavy burden' of proving both that he suffered

---

argued to the trial court (although I cannot be certain because the brief is not included in the Appendix) that pre-indictment delay violated these "broader" protections provided by the New York Constitution. Almonte I, 190 Misc. 2d at 790, 740 N.Y.S.2d at 768. His opening brief on direct appeal indicated that the delay violated his rights under the Fifth, Sixth, and Fourteenth Amendments (Amended Brief for Defendant-Appellant ("Appellant's Br."), attached as Exh. A to App., at 60-61), but the argument focuses on New York state cases discussing due process rights (Appellant's Br. at 61-72), as did the Appellate Division's opinion, see Almonte II, 90 A.D.3d at 579, 935 N.Y.S.2d at 294. Because the standards are so similar, raising the claim that trial delay violated Mr. Almonte's due process rights under the New York Constitution was likely sufficient to exhaust a Sixth Amendment speedy trial claim.  The closer question is whether the fact that he focused on pre-indictment delay and cited due process rights derived from New York law exhausted a federal due process claim. There is no need, however, to resolve that question. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

actual prejudice because of the alleged pre-indictment delay and
that such delay was a course intentionally pursued by the
government for an improper purpose,"[10] United States v. Cornielle,
171 F.3d 748, 752 (2d Cir. 1999) (emphasis omitted); a petitioner
seeking a writ of habeas corpus bears the even heavier burden of
showing that the state court's rejection of his claim was
objectively unreasonable.

Both the trial court and the Appellate Division found that Mr.
Almonte had not shown prejudice.  The trial court noted that

> [w]hile the defendant asserts that the release or
> destruction of various vehicles he posits were in the
> custody of the police in 1988 or 1989 is but one example
> of the prejudice his defense has suffered due to the
> delay in prosecution, he has failed to state just how the
> unavailability of forensic evidence has frustrated it.

Almonte I, 190 Misc. 2d at 791-92, 740 N.Y.S.2d at 769.  The court
continued:

> Simply put, all of the defendant's assertions of
> prejudice are wholly speculative and unsupported by
> factual allegations. Indeed, he acknowledges as much
> when, in discussing the witnesses who identified his
> photograph in 1989, but not in 1998, he states that
> "[a]rguably, potentially exculpatory information known to
> that witness is now lost whereas in 1989, an attorney or
> an investigator may have been able to use that
> information in Mr. Almonte's defense."

Id. at 792, 740 N.Y.S.2d at 769 (alteration in original) (quoting
Memorandum of Law in Support of the Pre-Trial Motions of Pablo

---

[10] Doggett's pronouncement that "excessive delay presumptively
compromises the reliability of a trial in ways that neither party
can prove," 505 U.S. at 655, and Barker's assertion that "[i]f
witnesses die or disappear during a delay, the prejudice is
obvious," Barker, 407 U.S. at 532, are therefore incompatible with
a claim of violation of due process rights because of pre-
indictment delay.

Almonte at 18).[11]  The appellate court agreed, finding the claim of prejudice "unpersuasive" because Mr. Almonte had not shown that "any of this [unavailable] proof would have been exculpatory." Almonte II, 90 A.D.2d at 579, 935 N.Y.S.2d at 294.

The conclusion that Mr. Almonte did not establish actual prejudice was not an unreasonable application of Supreme Court precedent.  The Second Circuit has noted that a defendant must present proof of prejudice that is "definite and not speculative" and "must demonstrate how (the loss of evidence) is prejudicial" to him.  United States v. Birney, 686 F.2d 102, 105-06 (2d Cir. 1982); accord United States v. Guerra, No. 10 CR 147, 2012 WL 1899861, at *5 (E.D.N.Y. May 24, 2012).  The petitioner here complains that by the time he was indicted (1) the gun taken from Mr. Almonte's jacket pocket and the automobile matching the key taken from that jacket were both destroyed, and (2) two witnesses present at the robbery had died.  (Pet. Memo. at 64-65).  He argues that the gun was "an obviously important source of evidence in a felony murder case"; that the destruction of the automobile "prevented the defense from testing whether the purported match was true"; and that "[t]he potential relevance of [the deceased witnesses'] lost testimony, given the problems of proof in the prosecution's case . . . , is obvious."  (Pet. Memo. at 64-65, 67).  Thus, he merely speculates that the evidence could have helped his defense.  This is far from the definite proof of prejudice required to state a due

---

[11] The respondent did not include this memorandum in the Appendix.

process claim.   Nor has the petitioner established that the prosecution delayed indictment in a deliberate attempt to gain tactical advantage.   Instead, he quibbles with the proof that the prosecution offered to explain the reason for the delay.  (Pet. at 61-64).   This claim therefore lacks merit.[12]

    C.   Ineffective Assistance

The Appellate Division noted that Mr. Almonte's claims that he was denied due process of law by the introduction into evidence of "redacted statements by a non-testifying codefendant [and] photographic evidence[,] and [by] a portion of the court's charge," Almonte II, 90 A.D.2d at 580, 935 N.Y.S.2d at 294-95, were defaulted.   Both parties agree that this is an independent and adequate state law ground, which generally prohibits federal habeas review, see Coleman v. Thompson, 501 U.S. 722, 729 (1991), unless the petitioner can show cause for and prejudice from the default, or that a miscarriage of justice would result from failure to address the claim, see Quirama v. Michele, 983 F.2d 12, 13-14 (2d Cir. 1993). (Resp. Memo. at 68-69; Pet. Memo. at 73-74).   Mr. Almonte argues that ineffective assistance of counsel "can constitute both" cause and prejudice, citing Murray v. Carrier, 477

---

    [12] In his petition (which was filed pro se), Mr. Almonte claims, as a separate ground for relief, that the trial court violated his constitutional rights by allowing the prosecution to re-present its case against him to a new grand jury. (Pet. at 2). His memorandum of law (filed by counsel) does not include this claim.   This is a state law issue, resolved on state law grounds. Almonte II, 90 A.D.3d at 580, 935 N.Y.S.2d at 294; Almonte I, 190 Misc. 2d at 786-89, 740 N.Y.S.2d at 764-67.   Assuming he still seeks to press the claim, it is not a basis for relief.   See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

U.S. 478 (1986).  (Pet. Memo. at 74).  Murray notes that the right
to effective assistance of counsel functions as a safeguard against
miscarriages of justice by informing "'what standards should govern
the exercise of the habeas court's equitable discretion' with
respect to procedurally defaulted claims."  477 U.S. at 496
(quoting Reed v. Ross, 468 U.S. 1, 9 (1984)) (internal brackets
omitted).   Thus, "[t]he ability to raise ineffective assistance
claims based in whole or in part on counsel's procedural defaults
substantially undercuts" the likelihood of "unremedied manifest
injustices."  Id.  That is, the case recognizes that a defaulted
constitutional error can be addressed in connection with a petition
for a writ of habeas corpus either through a showing of cause and
prejudice or through the lens of an ineffective assistance of
counsel claim.   To the extent that the petitioner contends that
Murray stands for the proposition that any petitioner who claims
ineffective assistance of counsel in relation to certain defaulted
claims is entitled to have those claims addressed on their own
merits (rather than under the ineffective assistance rubric), he is
mistaken.  Therefore, I will analyze the defaulted claims he raises
as instances of alleged ineffective assistance of counsel.

    To prevail on an ineffective assistance of counsel claim, a
criminal defendant must show (1) that "counsel made errors so
serious that counsel was not functioning as the 'counsel'
guaranteed the defendant by the Sixth Amendment" and (2) that "the
deficient performance prejudiced the defense."  Strickland v.
Washington, 466 U.S. 668, 687 (1984).  To demonstrate deficient

performance, the defendant must prove that his "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal quotation marks and citations omitted).

To show that the deficient performance prejudiced the outcome, the defendant must establish that the "likelihood of a different result [is] substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

The Supreme Court has counseled that these principles "do not establish mechanical rules." Strickland, 466 U.S. at 696. The focus of the inquiry should be on the fundamental fairness of the trial and whether, "despite the strong presumption of reliability, the result of the [] proceeding is unreliable because of a breakdown in the adversarial process." Id. Any errors of counsel must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001)(quoting Strickland, 466 U.S. at 695-96; accord Rodriquez v. Hoke, 928 F.2d 534, 538 (2d Cir.

27

1991).

For a habeas petitioner to succeed on an ineffective assistance of counsel claim, "he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance." Bell, 535 U.S. at 698-99. "[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, [a petitioner] must show that the [state appellate court] applied Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699 (internal citation omitted); see also Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam); Rosario v. Ercole, 601 F.3d 118, 123 (2d Cir. 2010). Where a defendant has made an insufficient showing with regard to one element of the Strickland standard, the court need not address the other. Strickland, 466 U.S. at 697.

### 1.   Statements of Non-Testifying Co-Defendant

Mr. Ramirez testified that Mr. Fernandez said that "he had participated in a case in which there was a dead policeman," and that "two other people [were] involved." (Tr. at 2350). Mr. Fernandez went on to say that the three of them went to a house containing money and drugs and "immobilized the people that were inside" by tying them up. (Tr. at 2351). As they were leaving, they "had an encounter with the cops" and tried to withdraw, "but they couldn't, so there was . . . no way out." (Tr. at 2351). One of the people with Mr. Fernandez "told him, 'I dropped one.'" (Tr. at 2352). After the encounter with the police, "they took the

[companion who had been wounded during the encounter] and they placed him in the car." (Tr. at 2353). They then took him to a doctor who "told him that he had to be operated [on], but that [the doctor] couldn't do that. And [] the next day they met at the airport and they left for Santo Domingo." (Tr. at 2353). Statements of Mr. Fernandez were also admitted through Mr. Fuertes' testimony. Mr. Fuertes testified that Mr. Fernandez told him that he and others had been involved in the robbery of a drug dealer in which they tied up the inhabitants of an apartment and stole five kilograms of cocaine using a garbage bag. (Tr. at 2501-02, 2506-07). Mr. Fernandez purportedly left the apartment first with the drugs. (Tr. at 2503). When he heard a gunshot, he dropped the bag of drugs. (Tr. at 2504). Mr. Almonte's counsel did not object to this testimony, which the petitioner asserts violated the Supreme Court's decisions in Bruton v. United States, 391 U.S. 123 (1968), Cruz v. New York, 481 U.S. 186 (1987), and their progeny. (Pet. Memo. at 69-75).

At issue in Bruton was a non-testifying defendant's confession that implicated his codefendant by name in the charged crime. 391 U.S. at 124-25. The Supreme Court held that "a defendant is deprived of his rights under the Confrontation Clause . . . when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." Cruz, 481 U.S. at 187-88 (1987) (explaining Bruton). In Cruz, the Court applied Bruton to the context in which a defendant has himself confessed and his

confession "interlocks" with a codefendant's confession, holding that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." Id. at 191-92, 193.   In Richardson v. Marsh, the Supreme Court "limited Bruton's scope," Gray v. Maryland, 523 U.S. 185, 189 (1998), holding that a codefendant's confession that is redacted to omit all indication that anyone other than the codefendant and a third person committed the crime does not offend the Confrontation Clause, even if "the defendant is nonetheless linked to the confession by evidence properly admitted against him at trial." Richardson, 481 U.S. 200, 202-03, 211 (1987).   Later, in Gray, the Court held that a introduction of a non-testifying codefendant's confession in which the defendant's name has been redacted and replaced with the word "deleted" or with a blank space violates Bruton because a jury will likely realize that such clumsy redactions refer specifically to the defendant.   Gray, 523 U.S. 185, 188, 193 (1998).   Each of these precedents constituted clearly established Supreme Court law at the time of Mr. Almonte's trial.

According to Mr. Almonte, introduction of Mr. Fernandez's confessions was improper even though all "express references" to Mr. Almonte were redacted and replaced with neutral identifiers. (Pet. Memo. at 70, Tr. at 2350).   "With the co-defendant's admission specifically implicating himself, Daniel Mirambeaux and

a third man, who was wounded, there can be no doubt, on the prosecutor's theory, that the third man was [Mr. Almonte]." (Pet. Memo. at 71).  He argues that it was unreasonable for his counsel to fail to object to the admission of the redacted statements and that he was prejudiced by the failure.  Addressing this claim, the state court held that the redactions "to avoid mention of [Mr. Almonte], who was only one of a group involved in the robbery," together with the trial court's limiting instruction that evidence of a defendant's confession cannot be applied to his codefendant, was sufficient to avoid violation of the Confrontation Clause. (440.10 Opinion at 5).  Additionally, the court held that, "in light of the crushing evidence against [Mr. Almonte], any error was harmless beyond a reasonable doubt." (440.10 Opinion at 5).  The decision was not an unreasonable application of <u>Bruton</u> and subsequent cases.

In <u>United States v. Jass</u>, the Second Circuit addressed a situation in which a codefendant's confession was redacted to "substitut[e] neutral pronouns or the phrase 'another person' for any reference to [the defendant]." 569 F.3d 47, 53 (2d Cir. 2009). The court noted that

> [t]he critical inquiry is [] not whether a jury might
> infer from other facts (whether evidence admitted at
> trial or circumstances such as the number of defendants
> on trial) that a declarant's neutral allusion to a
> confederate might have referenced the defendant.  It is
> whether the neutral allusion sufficiently conceals the
> fact of explicit identification to eliminate the
> overwhelming probability that a jury hearing the
> confession at a joint trial will not be able to follow an
> appropriate limiting instruction.

<u>Id.</u> at 61.  To determine whether there is a Confrontation Clause

31

violation, courts in this Circuit engage in a two-step process, asking, first, whether the redacted confession "indicated to the jury that the original statement contained actual names, and, second, whether the redacted confession, even if the very first item introduced at trial, would immediately inculpate [the defendant] in the charged crime." Id. at 61 (internal brackets and quotation marks omitted) (internal citations omitted).   In addressing the second inquiry, the court must "view the redacted statement in isolation to evaluate its likely impact on a jury." Id. at 62.

Here, "the redacted statements neither manifested 'obvious indications of alteration,' nor otherwise signaled to the jury that the statements had originally 'contained actual names.'" Id. (quoting Gray, 523 U.S. at 192, and United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989)).   Nor would the testimony, in isolation, immediately inculpate Mr. Almonte.   To be sure, when examined along with other evidence at trial -- testimony about Mr. Almonte's injury, its treatment, and his return to the Dominican Republic, for example -- the confessions seem to refer to Mr. Almonte.   But, as explained in Richardson, the "narrow exception" of Bruton does not cover cases where, because of redaction, the confession is not "incriminating on its face," but becomes incriminating "only when linked with other evidence [] at trial," because "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Richardson, 481 U.S. at

208; see also, e.g., United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004) ("[T]his case falls safely outside of Bruton's scope because substantial evidence was necessary to link defendants . . . with [their codefendant's incriminating] statements."). Because there was no Confrontation Clause violation, Mr. Almonte's counsel was not ineffective for failing to object to the introduction of the testimony. United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), abrogated on other grounds by Schindler v. National Organization for Women, Inc., 537 U.S. 393 (2003).

### 2. Jury Instructions

Mr. Almonte complains that his trial counsel did not request additional jury instructions defining the terms "deprive" and "appropriate" as they are used in the jury charge for larceny, which is an element of the crime of robbery. Instructions defining these terms explain that in order to deprive or appropriate, a defendant must withhold or exercise control over property permanently or for an extended period of time. Penal Law § 155.00(3), (4). The failure to request such an instruction allegedly constituted ineffective assistance because "[t]here was a significant jury question of what actually occurred and how much [cocaine] was actually taken from the apartment." (Pet. Memo. at 77). Mr. Almonte's theory here is that, if the men took "only the drugs [that they] had just purchased on consignment, then there was no larceny, no robbery, and no felony murder." (Pet. Memo. at 77).

33

The Second Circuit has held that

> counsel's failure to object to a jury instruction (or to
> request an additional instruction) constitutes
> unreasonably deficient performance only when the trial
> court's instruction contained clear and previously
> identified errors. Conversely, when a trial court's
> instruction is legally correct as given, the failure to
> request an additional instruction does not constitute
> deficient performance.

Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (citations

omitted) (internal quotation marks omitted). Mr. Almonte points to

People v. Blacknall, in which the New York Court of Appeals

reversed a conviction for attempted larceny because the trial judge

failed to instruct the jury on the statutory definitions of

"deprive" and "appropriate." (Pet. Memo. at 80 (citing Blacknall,

63 N.Y.2d 912, 913, 483 N.Y.S.2d 206, 207 (1984))). In that case,

the court reasoned that, because the prosecution presented evidence

that "defendant had been seen striking several women in the back of

the head before he reached out and pulled an earring from the

victim, that the earring fell to the ground, and that by the time

defendant was arrested, the victim and the earring both had

vanished," failure to instruct the jury on the temporal

requirements of deprivation or appropriation "could have misled the

jury into thinking that any withholding, permanent or temporary,

constituted larceny." Id. at 913-14, 483 N.Y.S.2d at 207 (internal

quotation marks omitted). In People v. Medina, the court

reaffirmed that the danger of failing to instruct a jury on these

statutory definitions arises where there is a question as to

whether the defendant had the intent "'to exert permanent or

virtually permanent control over the property taken, or to cause

permanent or virtually permanent loss to the owner of the possession and use thereof.'" 18 N.Y.3d 98, 105, 936 N.Y.S.2d 608, 613 (2011) (emphasis omitted) (quoting People v. Jennings, 69 N.Y.2d 103, 118, 512 N.Y.S.2d 652, 659 (1986)). The Medina Court found that omission of these definitions does not always require reversal, but that, in the context of that case -- in which the defendant argued that he was trying to prevent a robbery rather than commit one, so there was a significant question as to whether he intended to permanently deprive the owners of the use and possession of the cell phones found in his pocket -- the error was not harmless. See id. at 101-02, 104-06, 936 N.Y.S.2d at 610, 612-13.

The context here is quite different. Mr. Almonte does not suggest that there was a significant question about whether he intended to deprive the owners of the cocaine of its use and possession permanently rather than temporarily. Instead, his argument turns on whether he had the right to possess the cocaine because the quantity taken was no more than the amount that had been "purchased on consignment." (Pet. Memo. at 77-78). The omitted instructions would not have elucidated that question. Instead, that question was addressed by the instruction that "an owner is a person who has a right to possession of the property superior to that of the taker." (Tr. at 3018). Moreover, as the state court found, "there was no real issue that, notwithstanding some conflicting testimony regarding the precise number of pounds or kilograms of cocaine taken, the gunpoint robbery, in which

35

multiple perpetrators bound multiple victims, was merely a voluntary consignment." (440.10 Opinion at 3). Indeed, Mr. Almonte's trial counsel himself indicated that the amount of cocaine taken (and, therefore, any discrepancy between the amount taken and the amount consigned) was not material to the charge against Mr. Almonte; he stated, "Whether it's one kilo, one and a-half kilos or five to six kilos, it's worth something and one minute it's there and the next minute it's not, if you believe this robbery took place." (Tr. at 2755-56). Of course, this last comment points to Mr. Almonte's actual defense to the underlying felony of robbery. As the respondent asserts, "Although the defense did argue that it was questionable whether a robbery had ever occurred, that was based on a general assertion that the witnesses who testified about it were incredible, and not that some technical aspect of the crime of larceny had not been proven satisfactorily." (Resp. Memo. at 82).

In short, the trial court's instructions on larceny did not "contain[] clear and previously identified errors." Aparicio, 269 F.3d at 99 (internal quotation marks omitted). Mr. Almonte's trial counsel's failure to request additional instructions was therefore not deficient, as the § 440.10 court recognized. See Arena, 180 F.3d at 396.

### 3.   Photographs

Mr. Almonte contends that his counsel was ineffective for failing to object both to the prosecution's introduction of photographs of Officer Buczek, "first alive in his uniform, and,

then, dead during an autopsy" (Pet. Memo. at 81), and to related argument such as the prosecution's admonition to the jury not "to forget what's at the bottom, the core of this case, the whole thing. And that's Michael Buczek . . . . police officer, ordinary human being, [] friend, partner, husband, son, brother . . . . like any of you . . . ." (Tr. at 2821). The § 440.10 Court rejected the claim, finding that the introduction of the photographs was permissible and that counsel's failure to object was not deficient. (440.10 Opinion at 3). This was not an unreasonable application of clearly established federal law.

Mr. Almonte's counsel was justified in refraining from objecting to the initial introduction of the autopsy photos because their introduction was proper under state law. In New York, "[t]he general rule" is that "photographs are admissible if they tend 'to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered.' They should be excluded 'only if [their] sole purpose is to arouse the emotions of the jury and to prejudice the defendant[.]'" People v. Wood, 79 N.Y.2d 958, 960, 582 N.Y.S.2d 992, 993 (1992) (alterations in original) (emphasis omitted) (quoting People v. Pobliner, 32 N.Y.2d 356, 369-70, 345 N.Y.S.2d 482, 493 (1973)). Here, the autopsy photos were introduced during the testimony of the forensic pathologist from the Medical Examiner's Office. (Resp. Memo. at 77). The pictures were useful to "illustrate and corroborate [his] testimony." See People v. Hamilton, 66 A.D.3d 921, 922, 887

N.Y.S.2d 261, 262 (2d Dep't 2009).  Moreover, a federal court may review a state court evidentiary ruling only if it "so infused the trial with unfairness as to deny due process of law."  Estelle, 502 U.S. at 68, 75 (internal quotation marks omitted).  "Where the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process."  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (alteration in original) (quoting Estelle, 502 U.S. at 69), abrogated on other grounds by Perry v. New Hampshire, __ U.S. __, 132 S. Ct. 716 (2012); see also Reyes v. Ercole, No. 08 CV 4749, 2010 WL 2243360, at *12 (E.D.N.Y. June 1, 2010) (in second degree murder prosecution, "displaying the photographs of the victim's wounds, which were allegedly caused by a gun shot and led to her death, was highly probative of causing the death of a person as required by the statute").  Any objection to the admission of this evidence would have been futile.

Moreover, Mr. Almonte has not shown that the failure to object during the prosecution's summation was not a tactical decision on counsel's part.  "There are strategic reasons that an attorney might 'forgo objections: the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences.'"  Allan v. Conway, No. 08 CV 4894, 2012 WL 70839, at *33 (E.D.N.Y. Jan. 10, 2012) (quoting Taylor v. Fischer, No. 05 Civ. 3034, 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006)).

Mr. Almonte's sole argument on this point is that "there was simply no reason not to object." (Pet. Memo. at 86). This does not meet his burden of under <u>Strickland</u>. To the extent that Mr. Almonte mounts a claim that counsel was ineffective for failing to object to the focus on the victim in the prosecutor's summation, it also fails. "[O]bjections, particularly during a prosecutor's summation, are generally considered strategic in nature and therefore are not generally grounds for federal habeas relief." <u>OMazique v. Ercole</u>, No. 06 CV 1723, 2008 WL 2884370, at *9 (E.D.N.Y. July 23, 2008) (internal quotation marks omitted). Again, Mr. Almonte has not established that the failure to object was not a reasonable strategy.[13] The state court's rejection of his

---

[13] The single relevant case Mr. Almonte cites illustrates the sort of egregious conduct that courts will find violative of the Constitution. In <u>Washington v. Hofbauer</u>, the Sixth Circuit found defense counsel's failure to object to the prosecution's summation was "outside the wide range of professionally competent assistance," where,

> [i]n his initial summation, the prosecutor improperly implied that the jurors should consider Washington's unseemly character when rendering their verdict; in his rebuttal, he explicitly urged them to do so. Meanwhile, he attacked Washington as a "self-serving, illogical selfish non-compassionate, no emotional interest in a family type of person," who acted irrational due to "drugs and alcoholism and a general not caring about other people." The crime, he implored to the jury, "[s]ure fits him." The prosecutor thus articulated perhaps the paradigm of the improper "bad character" argument -- that the alleged criminal acts "fit" the evidence of Washington's character and lifestyle.

228 F.3d 689, 699-700, 702 (6th Cir. 2000) (internal citations omitted). Noting that "this character attack pervaded the closing argument and rebuttal," the court found the misconduct to be "severe." <u>Id.</u> at 700. There was no such severe misconduct at Mr. Almonte's trial.

ineffective assistance claim on this ground was not objectively unreasonable.

Conclusion

For the reasons set forth above, I recommend that Mr. Almonte's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the chambers of the Honorable Colleen McMahon, Room 1640, and to the undersigned, Room 1960, 500 Pearl Street, New York, NY 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       May 20, 2015

Copies transmitted this date:

Mitchell J. Briskey, Esq.
Legal Aid Society
Criminal Appeals Bureau
199 Water St.
New York, NY 10038

Susan H. Gliner, Esq.
Assistant District Attorney
One Hogan Pl.
New York, NY 10013